

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 10, 2018

Via ECF

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1106
New York, New York 10007

> Re:  *United States* v. *Carlos Alberto Valladares Garcia*,
>       S2 15 Cr. 174 (LGS)

Dear Judge Schofield:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for September 18, 2018, at 4:30 p.m., on the defendant's convictions of (i) conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Sections 963, 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), and 960(b)(2)(B), and (ii) conspiracy to use and carry firearms during and in relation to the drug-trafficking offense charged in Count One, in violation of Title 18, United States Code, Sections 924(o) and 924(c)(1)(A)(i).

The defendant was a high-ranking member of the *Pólicia National de Honduras*—the Honduran National Police—who corruptly used his position to support the criminal activities of large-scale drug traffickers and their associates. The defendant has acknowledged that for almost a decade he helped some of the most violent drug traffickers in Honduras import huge quantities of cocaine into the United States. But even more troubling is the fact that the defendant's conduct was not limited to simply helping transport narcotics or providing information to drug traffickers. Rather, the defendant participated in several murders in furtherance of the drug-trafficking conspiracy, including by engaging in a shootout in a nightclub that left several people dead. The defendant's conduct could hardly be more serious, and of the police defendants who have been sentenced in this case to date, Valladares is clearly the most culpable. Accordingly, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 168 to 210 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## RELEVANT BACKGROUND

### I.     THE *CACHIROS* DRUG-TRAFFICKING ORGANIZATION

For the past five years, this Office and the Drug Enforcement Administration has investigated multiple drug-trafficking organizations in South and Central America that work in concert to import huge amounts of cocaine into this country. Through that investigation, the Government identified Honduras as one of the principal transshipment points in the world for cocaine that is produced in South America and imported into the United States. (PSR ¶ 19). Beginning in at least 2004, multiple drug-trafficking organizations operating in Honduras worked in concert with politicians, law enforcement officials, and military personnel to receive multi-ton-kilogram loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States. (PSR ¶ 21).

Drug traffickers paid bribes—sometimes styled as "campaign contributions"—to Honduran politicians holding and/or running for office, on the understanding that the politicians would support trafficker-friendly policies regarding matters such as investigative priorities and extradition policy. (PSR ¶ 21). For further protection from official interference, and in order to facilitate the safe passage through Honduras of these massive loads of cocaine, drug traffickers also paid bribes to public officials—including certain members of the Honduran National Police—for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions. (*Id.*). These extensive drug-trafficking networks contributed to Honduras becoming one of the most violent places in the world. (*Id.*)

One of the most powerful drug-trafficking organizations identified during the course of this investigation was known as the *Cachiros*. (Mar. 6 Tr. 12:1-13:15).[1] The *Cachiros*, which was led between approximately 2004 and 2013 by brothers Devis Leonel Rivera Maradiaga and Javier Eriberto Rivera Maradiaga, was a prolific and violent criminal syndicate in Honduras responsible for receiving large loads of cocaine sent to Honduras from South America via air and maritime routes, and transporting the cocaine within Honduras on behalf of Mexican drug-traffickers who imported substantially all of the cocaine at issue into the United States. (Mar. 6 Tr. 12:1-13:15). To transport the cocaine through Honduras, members of the *Cachiros* typically used large trucks escorted by multiple security vehicles, some of which included members of the Honduran National Police.[2] (*See, e.g.*, Mar. 6 Tr. 16:1-19, 18:1-19:8).

---

[1] "Mar 6 Tr." refers to the transcript of the testimony of Devis Leonel Rivera Maradiaga from the *Fatico* hearing on March 6, 2017, in *United States* v. *Fabio Porfirio Lobo*, 15 Cr. 174 (LGS).

[2] In 2013, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated the *Cachiros* organization, as well as seven individuals and five businesses tied to the *Cachiros* (including Leonel Rivera and Javier Rivera) as Specially Designated Nationals and Blocked Persons ("SDNs") pursuant to the Foreign Narcotics Kingpin Designation Act. OFAC stated when it announced the sanctions, among other things, that the "*Cachiros* is a violent drug trafficking organization in Honduras whose members plow illicit drug proceeds into businesses and properties in order to gain public legitimacy and launder their wealth." *See*

## II.    THE DEFENDANT'S CRIMINAL CONDUCT WITH THE *CACHIROS*

The defendant's membership in the *Cachiros* began when he met Leonel Rivera in approximately 2004. At the time, the defendant—who had already been a member of the Honduran National Police for approximately ten years—was investigating Leonel Rivera in connection with a shooting (to which Leonel Rivera has now pleaded guilty in the United States). Instead of honorably fulfilling his duties as a law enforcement officer, the defendant agreed not to execute an arrest warrant for Leonel Rivera at the conclusion of that investigation. The defendant's decision to help rather than stop Leonel Rivera began a criminal relationship that would last for almost ten years. During that time, the defendant participated in the *Cachiros* criminal enterprise by engaging in acts of violence and supporting their drug-trafficking activities.[3] While the defendant was assisting violent drug traffickers in private, in public he was rising through the ranks of the Honduran National Police holding various high-ranking positions including, among others, police chief of various departments in Honduras. *See* Ex. A, DEA Interview of the Defendant (Mar. 22, 2017).

### A.    The Defendant was Involved in Numerous Murders with the *Cachiros*

The *Cachiros* committed and caused numerous acts of violence in furtherance of their drug-trafficking activities. The defendant was involved in some of those violent acts, including several murders.

In approximately 2008, the defendant participated in a shootout in a nightclub that left several people dead. Prior to the shooting, a member of the *Cachiros* ("Victim-1") killed an associate of another major Honduran trafficker ("CC-1"). At CC-1's request, Leonel Rivera, Javier Rivera, and a Honduran congressman agreed to have Victim-1 killed. Leonel Rivera and Javier Rivera lured Victim-1 to a nightclub in San Pedro Sula named *Bailables de Occidente*, which was owned by their uncle. A shootout occurred inside the club, in which the defendant participated by firing his weapon. Several members of Victim-1's security team were killed during this incident. (PSR ¶ 51).

In approximately October 2011, the defendant drove Leonel Rivera to an airport so they could witness a mass casualty attack on rival drug traffickers. Prior to the day of the shooting, Leonel Rivera, Javier Rivera, and several drug-trafficking associates agreed to murder a man known as "El Sapo," who led the "Los Grillos" gang, which they believed had been

---

https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx. The *Cachiros* and their various business entities remain designated by OFAC.

[3] In April 2016, the Government of Honduras declared an "emergency situation" with respect to the Honduran National Police, and established a Special Commission with authority to investigate corruption and dismiss or suspend its members. The legislative decree establishing the Special Commission stated, in substance and in part, that the Honduran National Police needed to restore its trustworthiness and credibility as the institution responsible for ensuring the safety of Honduras.

stealing money and cocaine from drug traffickers in Honduras. At the direction of Leonel Rivera, one of the other co-defendants in this case assembled a team of assassins, including other members of the Honduran National Police. Leonel Rivera learned from Honduran law enforcement that El Sapo would be at an airport in San Pedro Sula, and the defendant escorted Leonel Rivera to and around the airport where they watched the attack from a nearby vehicle. El Sapo was apparently not killed, but the assassins murdered El Sapo's cousin. According to Honduran news reports, six suspected gang members were murdered in the attack. (PSR ¶ 52).

In approximately 2011 or 2012, the defendant identified and helped capture perpetrators of a murder so they could be killed by associates of the *Cachiros*. The perpetrators had murdered the pregnant wife of a cousin of Leonel Rivera ("Victim-2") and wounded her mother and sister. The attack happened after Victim-2 cashed a check at a bank in Tegucigalpa. The defendant and other Honduran National Police helped Leonel Rivera identify two of the killers, including by obtaining security footage from the bank. One of Leonel Rivera's associates lured the perpetrators to a meeting at a business in Tegucigalpa, where they were kidnapped with assistance from the defendant and others. Leonel Rivera's workers transported the two men to a *finca* (without the defendant), where they were tortured and murdered. (PSR ¶¶ 52-53).

### B. The Defendant Supported the *Cachiros'* Drug-Trafficking Activities

The defendant also personally participated in the *Cachiros* drug-trafficking activities. On at least four occasions, the defendant rode with Leonel Rivera in an escort vehicle accompanying a truck loaded with cocaine. (PSR ¶ 49). At other times, the defendant stayed in San Pedro Sula during drug-transport operations, remaining in contact with Leonel Rivera to coordinate as the truck with the cocaine passed through police checkpoints. (*Id.*). The defendant also assisted the *Cachiros* by identifying other members of the Honduran National Police who could assist with their drug-trafficking activities. (PSR ¶¶ 55-58). For example, in June 2014, at the direction of Leonel Rivera, the defendant recruited six other members of the Honduran National Police to participate in a drug deal with Fabio Porfirio Lobo and purported members of the Sinaloa Cartel. (*Id.*).

### C. The Defendant's Admissions Concerning His Criminal Conduct

The defendant has acknowledged much of his criminal conduct with the *Cachiros*. In February 2017, Leonel Rivera placed a consensually recorded call to the defendant during which the defendant discussed his role in many of the foregoing crimes.[4] (PSR ¶¶ 59-65). Specifically, the defendant admitted to, among other things, the following:

- The defendant "travel[ed] to Tocoa" with Leonel Rivera in connection with drug shipments "around six times," and the defendant and others possessed "regular," "regulated" weapons—*i.e.,* their service firearms—during the trips.

---

[4] The PSR suggests that the defendant was recorded discussing his criminal conduct during the June 2014 meeting involving confidential sources. *See* PSR ¶ 58. This is incorrect. PSR paragraphs 59 through 65 reflect statements made by the defendant during the February 2017 call placed by Leonel Rivera to the defendant.

- The defendant accepted Leonel Rivera's request to "'solve [his] problems" and "solve [his] people's problems." For example, the defendant admitted that in connection with the murder of Victim-2, he recovered surveillance video of the suspected killers at the bank, helped locate the suspected killers, and was present when they were kidnapped ("there were over 30 people, including policeman and your people, and they took those guys with them" // "what we were supposed to do then was the capture").

- At the request of Leonel Rivera, the defendant and other Honduran law enforcement removed a seized truck from a secure premises in order to recover approximately 100 kilograms of cocaine in exchange for approximately $80,000 per person for those who participated in the operation. Later during the call, the defendant indicated that the truck had been secured at premises belonging to the *Honduran Oficina Administradora de Bienes Incautados* ("OABI"), and that he had coordinated with a former regional director of OABI in San Pedro Sula to access the vehicle.

- The defendant was part of a 30-person security detail, armed with "M-16s," when drug traffickers associated with the *Cachiros* received a cocaine load at an airstrip in the Cortes Department. The defendant indicated that he was paid approximately $3,000 and that another drug trafficker was present at the airstrip.

- The defendant was present with Leonel Rivera and Lobo around the time a drug load was coming into Omoa, Cortes, and recalled Lobo pressing Leonel Rivera to take him to the landing strip where the plane was to arrive.

On March 22, 2017, after the charges against the defendant were made public, he participated in an interview with DEA personnel at the U.S. Embassy in Tegucigalpa. During the interview, the defendant stated:

o The defendant began working for the Honduran National Police in 1995 and held positions including: (i) police chief in El Progreso, Yoro Department (2005); head of the personnel division in San Pedro Sula (2006-2009); investigative coordinator in Santa Barbara (2009); police chief in Quimistan, Santa Barbara (2010-2013); and police chief in Gracias Lempira (2013). Ex. A at 1-2.

o While assigned to the El Progreso, Yoro Department, the defendant received an award from the U.S. Embassy for his work on gang-related crimes. In 2005 and 2009, the defendant was recognized by the Honduran National Police for his work as a police officer. Ex. A at 2.

o The defendant was dismissed from the Honduran National Police because he failed a polygraph examination in June 2013. In particular, the defendant was

nervous when he answered questions related to his association with organized crime, taking bribes, and illegal conduct involving drugs.[5]  Ex. A at 2.

o  The defendant met Leonel Rivera in approximately 2004 when he was chief of the homicide division in San Pedro Sula.  Prior to the meeting, the defendant accepted a bribe from Leonel Rivera's cousin in exchange for the defendant not executing an arrest warrant on Leonel Rivera for participating in a shooting that targeted a drug trafficking rival and his girlfriend.  The defendant subsequently met with the girlfriend to convince her to not press charges against Leonel Rivera.  Ex. A at 3.

o  Whenever the defendant provided Leonel Rivera with assistance, he was paid between 20,000 and 30,000 Lempiras.  For example, the defendant provided Rivera with legal advice and recovered a handgun belonging to one of Rivera's friends that had been seized by law enforcement.  Ex. A at 3.

o  The defendant admitted driving Leonel Rivera to the airport attack in 2011, but denied knowing an attack was going to take place.  However, while they were waiting at the airport, the defendant acknowledged that Leonel Rivera told him "you are going to hear how is the war" prior to the attack commencing.  Ex. A at 4.

o  In approximately 2010 or 2011, the defendant helped Leonel Rivera recover $2,000,000 USD in drug currency that had been seized by law enforcement.  The defendant delivered the proceeds to two associates of the *Cachiros*.  Ex. A at 4.

o  In approximately 2012, the defendant accompanied Leonel Rivera and Fabio Porfirio Lobo while they waited for a cocaine-laden aircraft to arrive at a clandestine airstrip in the Cortes Department.  Ex. A at 5.

## III.  THE DEFENDANT'S GUILTY PLEA

On April 24, 2018, the defendant appeared before the Honorable Stewart D. Aaron and pled guilty pursuant to a plea agreement to a lesser-included offense of Count One and to Count Three of the S2 Superseding Indictment.  During his plea allocution, the defendant stated that "from 2005 until June of 2014, I agreed with other people to possess and distribute 500 grams and more of cocaine knowing that eventually [the cocaine] would be imported to the United States."  Ex. B, Plea Tr. at 17.  The defendant also stated that between 2005 and 2014, "I carried firearms in relation to" the conspiracy to import cocaine and that he agreed with others to do so.  *Id.* at 17-18.

The Government respectfully requests that the Court accept the defendant's guilty plea.  Attached for the Court's consideration are the transcript of the defendant's plea allocution (Ex. B), a copy of the parties' plea agreement (Ex. C), and a proposed order (Ex. D).

---

[5] During his interview with Probation, the defendant stated that he was terminated by the Honduran National Police because "they restructured and he was laid-off."  (PSR ¶ 102.)

## DISCUSSION

### I. A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. Such a sentence would appropriately take into account the Guidelines and Section 3553(a) factors.

#### A. The Seriousness of the Offense and the Need to Afford Adequate Deterrence

Most significantly, a substantial sentence would properly reflect the incredible seriousness of the offense, promote respect for the law, and provide just punishment. As a high-ranking member of the Honduran National Police, the defendant spent almost a decade supporting the *Cachiros'* violent drug-trafficking activities in Honduras. There are several aspects of the defendant's conduct that make it particularly troubling.

*First*, the defendant participated in the gravest conduct by engaging in a shootout that left several individuals dead. As noted above, in 2008, Leonel Rivera and Javier Rivera planned to kill one of their associates at the request of another Honduran drug trafficker. As a result, Leonel Rivera and Javier Rivera lured the intended victim to a nightclub to be killed. The defendant accompanied the Riveras to the nightclub and was among those who participated in a shootout resulting in the deaths of several individuals. The 2008 shooting was not the defendant's only involvement in acts of violence. In October 2011, the defendant drove Leonel Rivera to an airport in San Pedro Sula to observe a shootout between members of the *Cachiros* and rival drug traffickers, which left approximately six people dead. In fact, prior to the shooting, Leonel Rivera told the defendant he would be witnessing a "war." And in approximately 2012, the defendant helped Leonel Rivera kill two individuals by identifying them as perpetrators of a murder and assisting in their kidnapping.

*Second*, the defendant was a significant part of the *Cachiros'* drug-trafficking operations. On numerous occasions, the defendant accompanied Leonel Rivera during the transportation of drugs; was present at airstrips when substantial quantities of drugs were received by the *Cachiros*; and communicated with Leonel Rivera while the *Cachiros* transported drugs through Honduras. The defendant also carried a firearm during at least some of this conduct and was present with security teams that were armed with assault rifles.

*Finally*, the defendant flagrantly used his position in the Honduran National Police to help the *Cachiros*. The abuse of his position of privilege began in approximately 2004 when he met Leonel Rivera and agreed to shut down an investigation that had identified Rivera as the perpetrator of a homicide. Here, context is important. At the time the defendant met Leonel Rivera, he was not a low-ranking officer—he was a 10-year veteran of the Honduran National Police and chief of the homicide unit in San Pedro Sula. Nevertheless, the defendant agreed to assist Leonel Rivera instead of doing what he had pledged to do—investigate and arrest violent individuals in his country.

Over the next decade, and while the defendant was rising through the ranks of the

Honduran National Police and receiving awards for his purportedly honorable conduct, the defendant regularly took advantage of his position to assist the *Cachiros*. For example, the defendant (i) convinced a witness to not press charges against Leonel Rivera for a homicide; (ii) provided information to the *Cachiros* concerning police checkpoints; (iii) recruited other Honduran National Police officers to assist the *Cachiros*; (iv) worked with other corrupt cops to remove a seized truck from a secure premises to recover approximately 100 kilograms of cocaine in exchange for approximately $80,000; and (v) recovered $2,000,000 USD in drug-trafficking proceeds that was seized by law enforcement and returned it to the *Cachiros*.

The defendant fails to address this reprehensible conduct in his sentencing materials. Rather, in his sentencing submission, defense counsel refers to the defendant "doing favors for people who controlled drug trafficking" (Def.'s Memo at 6) and, in his letter to the Court, the defendant states that he "was an excellent police officer in [his] country" who made a "mistake" (Def.'s Memo, Ex. A at 2). These are stunning statements. Participating in a shootout that left people dead is not a "mistake"; accompanying tons of cocaine through Honduras with armed security teams is not doing someone a "favor"; and using an official position to steal $2,000,000 in drug trafficking proceeds from law enforcement is not consistent with being an "excellent police officer." Nor was this conduct born out of a fear of the *Cachiros*. The Government acknowledges that Javier Rivera and Leonel Rivera were the leaders of the *Cachiros* and generally directed the defendant's criminal activities. However, the defendant was not coerced or forced into participating into almost ten years of criminal activity. Rather, the defendant had every opportunity to withdraw from the conspiracy and instead chose to repeatedly participate in acts of violence and drug-trafficking operations in exchange for significant financial compensation. *See, e.g.*, Ex. A at 3 (defendant stating that he received between 20,000 and 30,000 Lempiras every time he provided information to Leonel Rivera); PSR ¶ 61 (defendant stating that he received $80,000 USD payment for assisting in the transportation of cocaine in Honduras).

At bottom, the defendant's close and long-standing relationship with the *Cachiros*, and the evidence of his direct participation in acts of violence, underscores the seriousness of the offense. Operating from a position of privilege, the defendant facilitated drug-trafficking activities that ravaged the country he purports to have served. To state the obvious, there was no compelling reason for the defendant to do so. He was an educated man, trained as a lawyer, who held various high ranking positions with the Honduran National Police. Faced with an opportunity to help identify, investigate, and incapacitate criminals around him, the defendant instead chose to join them and assist them for years. Thus, a Guidelines sentence is also important to promote respect for the law and to achieve general deterrence of the types of activities that have allowed drug trafficking to flourish in South and Central America.

### B.     A Guidelines Sentence Would Avoid Unwarranted Sentencing Disparities In this Case

The Court previously sentenced co-defendants Carlos Jose Zavala Velasquez and Victor Oswaldo Lopez Flores to 12 and 5 years in prison, respectively, both for conspiring to import cocaine into the United States while acting as members of the Honduran National Police. Zavala Velasquez's conduct involved providing law enforcement information to a major drug-

trafficker in Honduras for approximately three years, and Lopez Flores's conduct was limited to his participation in the June 2014 sting operation discussed at PSR paragraphs 55 through 58.

The defendant is far more culpable than both of those defendants. Valladares maintained a years-long relationship with the *Cachiros* and was a much more active participant in their operations. Moreover, the defendant, unlike Zavala Velasquez and Lopez Flores, has admitted to participating in acts of violence, including murders, during the course of the conspiracy. As a result, a Guidelines sentence—that is, a sentence longer than both Zavala Velasquez and Flores' sentences—would avoid unwarranted sentencing disparities among defendants. *See* 18 U.S.C. § 3553(a)(6) (Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines Range is appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  _____
Emil J. Bove III
Matthew Laroche
Assistant United States Attorneys
(212) 637-2420


cc:    Defense Counsel (by ECF)